## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DEBORAH S. KEAHL,

     Plaintiff,

v.                              CASE NO. 4:15-cv-15-RH-GRJ

UNITED STATES OF AMERICA,

     Defendant.[1]

_____/

## <u>REPORT AND RECOMMENDATION</u>

This case is presently before the Court on Defendant's Motion for

Summary Judgment. (ECF No. 98.) Plaintiff has filed a response in

opposition to the motion, ECF No. 100, and the motion is otherwise ripe for

review. For the following reasons, the undersigned recommends that

Defendant's motion for summary judgment be granted.

## I.  INTRODUCTION

Plaintiff, a federal prisoner proceeding *pro se*, initiated this action

under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*, and

---

[1] Plaintiff's claims against Defendants Flournoy, Mendoza, Carbonell, and Gomes were dismissed with prejudice on March 9, 2016. (ECF No. 76.) Accordingly, the **Clerk** is directed to terminate Defendants Flournoy, Mendoza, Carbonell, and Gomes from this action.

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403

U.S. 388 (1971). (ECF No. 1.)  On March 9, 2016, the Court dismissed all

of Plaintiff's claims with prejudice except for her claim for negligence under

the FTCA against Defendant United States. (ECF No. 76.) Plaintiff's

negligence claim alleges that Defendant, via the Federal Bureau of Prisons

("BOP"), breached its duty by failing to provide proper medical care

according to BOP policy for treatment of a macular hole in her right eye,

which she alleges caused permanent blindness in her right eye. (ECF No.

7.)[2]

As background, a "macular hole is a small break in the macula,

located in the center of the eye's light-sensitive tissue called the retina."

*Facts About Macular Hole*, National Eye Institute,

https://nei.nih.gov/health/macularhole/macularhole (last reviewed April

2012). "Most of the eye's interior is filled with vitreous, a gel-like substance

---

[2] Plaintiff's first amended complaint asserted six tort claims against the United States under the FTCA: (1) negligence per se for failure to provide proper medical care; (2) deliberate indifference to a serious medical need; (3) wanton and unnecessary infliction of pain and suffering; (4) intentional denial or delay of access to necessary medical care; (5) intentional infliction of mental and emotional distress; and (6) discrimination. (ECF No. 7 at 9.) Because Plaintiff's tort claims were, in general, based upon her negligence claim, her negligence claim is properly viewed as a negligence claim under the FTCA and not a medical malpractice claim under the FTCA.

that fills about 80 percent of the eye and helps it maintain a round shape. .

. . . [I]f the vitreous is firmly attached to the retina when it pulls away, it can

tear the retina and create a macular hole." *Id.* There are three stages to a

macular hole: (1) Stage one: Foveal detachments; (2) Stage two: Partial-

thickness holes; and (3) Stage three: Full-thickness holes. *Id.*

Defendant requests summary judgment on the grounds that Plaintiff

has failed to establish: (1) the BOP breached any legal duty owed to

Plaintiff, and (2) the BOP's conduct caused Plaintiff's damages. (*Id.*) As

support, Defendant has filed portions of Plaintiff's deposition, various

declarations, copies of Plaintiff's medical records, and copies of Plaintiff's

grievances.[3]

Plaintiff has filed a response in opposition to the motion for summary

judgment attaching copies of various medical records, grievances, and a

sworn declaration. (ECF No. 100.) In resolving the motion for summary

judgment the Court must view the evidence submitted by the parties in

tandem with an eye towards whether there are any genuine disputed

---

[3] Portions of Defendant's evidence were submitted in its reply to refute new allegations Plaintiff made in her response to the motion for summary judgment. (ECF No. 103.) Other evidence was previously filed in support of Defendant's motion for summary judgment or in the alternative motive to dismiss, upon which all claims were dismissed except for the negligence claim. (ECF Nos. 48–49.)

material facts. Importantly, the issue is not whether Plaintiff became blind because of a macular hole; instead, the issue is whether her blindness was caused by any delay in her eye surgery.

## II. EVIDENCE

Most of the events in this case are not seriously disputed other than when Plaintiff first reported to prison officials at the Federal Correctional Institution in Tallahassee, Florida ("FCI Tallahassee") that she was experiencing some blindness in her right eye. As discussed in the Court's previous report and recommendation, Plaintiff says she first reported the problem with her right eye on December 13, 2011, but that she was simply told to watch for her call-out with Ms. West, which did not occur until December 28, 2011. (ECF No. 7 at 6 ("Pl. Compl.")[4]; ECF No. 98-1, 83:16, ("Pl. Dep."); ECF No. 100 at 55–56, ¶ 2 ("Pl. Dec.").)

There are no records, however, that Plaintiff was seen by medical staff on December 13, 2011, nor any record about Plaintiff's complaints

---

[4] Because Plaintiff's first amended complaint was signed under penalty of perjury, her first amended complaint is also treated by the Court like a sworn affidavit. *See Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[T]his Court has recognized that facts alleged in an inmate's sworn pleading are sufficient [to defeat a properly supported motion for summary judgment] and that a separate affidavit is not necessary.").

concerning her vision. (ECF No. 48-2, ¶ 4 ("Carbonell Dec.")). Further, the

medical record of Plaintiff's encounter with Nurse West on December 28,

2011, does not include any notation or mention of complaints by Plaintiff of

vision problems. (ECF No. 49-1.) Instead, the December 28, 2011 medical

note reflects that the purpose of Plaintiff's visit to medical was to: (1) follow

up on thyroid test/other labs and her thyroid ultrasound, (2) try the

prescription inderal to help reduce her headaches, (3) change Plaintiff's

medication for depression, and (4) inquire about an ultrasound for her

heart murmur. (*Id.*)

The first record of Plaintiff's report of partial blindness in her right eye

was during her appointment with Ms. West on January 11, 2012. The

record includes the notation: "Requesting to see the eye doctor. Says that

he told her last year that she might be developing glaucoma and wanted to

see her again, but she hasn't been scheduled. Also says that she is

developing a blind spot in her right eye. No pain." (West Dec. ¶ 6; ECF No.

100 at 7.)  After the medical visit Nurse West made a referral for Plaintiff to

see Dr. Wells, the optometrist. (West Dec. ¶ 6.)

Ms. West says she "took notes during and immediately after medical

appointments with inmates," and that those notes "were electronically

inputted into the inmates' medical records maintained by the BOP." (*Id.* ¶ 3.) Ms. West maintains that Plaintiff did not report any problem with her eyes or vision when she saw and treated Plaintiff on December 28, 2011. (*Id.* ¶ 5.) Furthermore, when an entry is made into the Bureau Electronic Medical Record ("BEMR") system, it cannot be deleted. (ECF No. 103-1, ¶ 3 ("Ocampo Dec.")). Entries can be amended, but the record will show that the entry has been amended. (*Id.*) There have been no records removed from Plaintiff's file regarding her medical care. (*Id.* ¶ 5.)

There is little dispute, however, regarding the timing of the events that took place after January 11, 2012. Plaintiff saw Dr. Wells on February 8, 2012, at which time Plaintiff reported that she "developed a blind spot on her right eye which started 2 months ago." (ECF No. 100 at 9.) Examination revealed that Plaintiff had developed a macular hole. (*Id.*) Dr. Wells appropriately recommended that Plaintiff be referred to a retinal specialist. (*Id.*) On the same day Dr. Wells recommended the referral to a retinal specialist Efren Carbonell, M.D., Clinical Director at FCI Tallahassee, generated a consultation request for Plaintiff to "get se[e]n by a Retinal specialist ASAP." (*Id.* at 10; Carbonell Dec. ¶ 5.) Dr. Carbonell and Dr. Wells conferred regarding the referral and concurred that Plaintiff

should be seen within 60 days "to minimize the chances of central

blindness [in] her right eye." (Carbonell Dec. ¶ 5; ECF No. 100 at 16.) The

consultation request was approved by the Utilization Review Committee

the very next day, categorizing Plaintiff's condition as "Medically

Necessary-Acute Emergent." (ECF No. 100 at 15.)

Plaintiff saw the retinal specialist, Dr. Aaron Appiah, on March 14,

2012. (ECF No. 100 at 13; ECF No. 49-5 at 4.) Dr. Appiah examined

Plaintiff and wrote in the medical record, "[t]he soon[e]r the surgery is

performed the better the outcome. Institution will set up surgery." (*Id.*) Two

days later, Dr. Carbonell approved the surgery request for Plaintiff, with a

scheduled target date of March 28, 2012, noting that her level of care is

"Medically Necessary-Acute or Emergent," and that the surgery "needs to

be done as soon as possible to improve outcome." (Carbonell Dec. ¶ 6;

ECF No. 49-6.) Upon this approval, prison administrative staff contacted

Dr. Appiah's office, which then scheduled Plaintiff's surgery. (Carbonell

Dec. ¶ 6; ECF No. 100 at 22.)

Plaintiff underwent surgery on her right eye on May 24, 2012. (Pl.

Compl. at 6; Carbonell Dec. ¶ 6; ECF No. 49-8.) Dr. Appiah instructed

Plaintiff to keep her eye patched, remain in the prone position as much as

possible, and use three types of eye drops—ofloxacin, diclofanac sodium, and prednisolone acetate. (ECF Nos. 49-9, 49-10.) Dr. Appiah's prescriptions included alternatives for each type of drop: (1) either Vigamox, Ofloxacin, or Zymar; (2) either Nevanac, Acular LS (generic ok), or Diclofenac; and (3) either Omnipred or Pred Forte. (ECF No. 103-2.) Accordingly, FCI Tallahassee ordered Plaintiff 14-day prescriptions of the following: (1) moxifloxacin;[5] (2) diclofenac sodium; and (3) prednisolone acetate.[6] (ECF No. 103-3.) Ms. West discharged Plaintiff to the housing unit with convalescence and instructed her to lie face down as much as possible and keep her eye patched. (*Id.*)

Dr. Appiah's follow-up examination on June 1, 2012, revealed that the macular hole was smaller but not fully closed. (ECF No. 49-10.) At a routine chronic area evaluation on June 11, 2012, Plaintiff reported to Ms. West that she was back to work and has not been lying face down very much. (ECF No. 49-11.) Ms. West advised Plaintiff to take more time off to try to be able to lay down more through the day to see if it helps with her post-operative eye care. (*Id.*)

---

[5] Moxifloxacin is the generic version of Vigamox. (ECF No. 103-4.)

[6] Prednisolone acetate is the generic version of Pred Forte. (*Id.*)

At her July 2, 2012 follow-up, Dr. Appiah noted that Plaintiff had compliance issues with the three eye drops, as she reported that she stopped using them one week ago. (ECF No. 49-12.) Examination revealed that the macular hole was closable with edges touching. (*Id.*) That same day, Plaintiff underwent a procedure in another attempt to close the hole. (*Id.*) Dr. Appiah prescribed alphagan drops and tobradex and advised Plaintiff to remain in the prone position upon return to FCI Tallahassee. (*Id.*)

At her July 18, 2012 follow-up with Dr. Appiah, Plaintiff reported that she used the brimonidine drops for 14 days but had stopped 3 days ago. (ECF No. 100 at 31–34.) Examination revealed that Plaintiff's macular hole was still open. (*Id.*) Dr. Appiah noted: "Macular hole unclosed was too old before surgery." (*Id.*)

According to Plaintiff, FCI Tallahassee would not give her the eye drops that Dr. Appiah had prescribed. (Pl. Dec. ¶ 7.) She admits, however, that she was nonetheless receiving drops on a daily basis. (ECF No. 103-5, 132:6–8.) And although she initially asserted that FCI Tallahassee did not give her adequate medical convalescence to enable her to comply with Dr. Appiah's instructions to remain in the prone position, she later admitted

that she had convalescence passes from May 25, 2012 through June 5, 2012, June 11, 2012 through June 17, 2012, and July 2, 2012 through July 14, 2012. (Pl. Dec. ¶ 8; Pl. Dep. 131:3–12.) Thus, Plaintiff concedes that provisions were made for her to be able to follow Dr. Appiah's instructions to maintain a prone position. (Pl. Dep. 131:13–16.) Plaintiff says she is now permanently blind in her right eye. (Pl. Dec. ¶ 11.)

Defendant has submitted and relies upon the expert report of Kenneth D. Rappaport, M.D., a retinal specialist in solo practice at First Coast Retina Center, P.A. (ECF No. 98-3, ¶ 1 ("Rappaport Dec.")). Dr. Rappaport earned his Bachelor of Science degree from Duke University in 1989, and his Medical Degree from the Medical College of Virginia in 1994. (*Id.* ¶ 2.) After graduation, Dr. Rappaport completed his residency in Opthalmology at the Medical College of Virginia followed by a fellowship at Boston University and the Veteran's Administration Medical Center in Boston, Massachusetts, in vitreo-retinal diseases. (*Id.* ¶ 3.) As a retinal specialist, Dr. Rappaport has treated more than 100 patients with macular holes. (*Id.* ¶ 5.)

According to Dr. Rappaport, Plaintiff has full thickness macular hole with epiretinal membrane. (*Id.* ¶ 7.) As much as 90% of macular holes

close with intervention, provided the patient is cooperative with post-

operative positioning. (*Id.*) Dr. Rappaport concludes that:

> Ms. Keahl received reasonable treatment and the prison's
> treatment was within the standard of care. I believe it was
> reasonable for her to have been seen by the Retinal Specialist
> within 60 days of her visit with the optometrist. According to Ms.
> Keahl's medical records, her vision was essentially stable from
> her first complaint to the BOP on January 11, 2012 until the
> time of surgery on May 24, 2012. Considering the stability of
> her condition and the fact that the best visual prognosis for
> macular hole results when surgery is performed within 6
> months of full-thickness macular hole onset, it was reasonable
> for her to have undergone eye surgery to repair the macular
> hole on May 24, 2012.

(*Id.* ¶ 8.) He further opines that "[a]lthough vision loss was related to the

development of the macular hole, Plaintiff's current diagnosis was not

caused by any delay in her eye surgery." (*Id.* ¶ 9.) Instead, Plaintiff's "lack

of visual improvement after surgery was the result of the non-closure of the

macular hole," and that "[p]rogressive cataract formation (vitrectomy

surgery) is the likely cause of further vision loss since Plaintiff's surgery."

(*Id.* ¶¶ 9–10.)

## III.  STANDARD OF REVIEW

In accordance with Rule 56(a), the entry of summary judgment is

appropriate only when the Court is satisfied that "there is no genuine

dispute as to any material fact and the movant is entitled to a judgment as

a matter of law." In applying this standard, the Court must examine the

pleadings, depositions, answers to interrogatories, and admissions on file,

together with any affidavits and other evidence in the record "in the light

most favorable to the nonmoving party." *Samples on Behalf of Samples v.*

*Atlanta,* 846 F. 2d 1328, 1330 (11th Cir. 1988.) But, "when opposing

parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for

summary judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir.

2013) (internal quotations and citations omitted); *see also Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat summary judgment

"there must be evidence on which the jury could reasonably find for the

plaintiff") "The nonmovant need not be given the benefit of every inference

but only of every reasonable inference." *Brown v. City of Clewiston,* 848

F.2d 1534, 1540 n. 12 (11th Cir.1988) ("The summary judgment standard

requires that we resolve all reasonable doubts in favor of the non-moving

party, but it does not require us to resolve all doubts in such a manner.").

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317

(1986), the moving party bears the initial burden of establishing the

nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987.) The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005.)

In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage." *Beard v. Banks,* 548 U.S. 521, 530 (2006). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See, e.g., Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001.)

# IV. DISCUSSION

The FTCA was designed to provide redress where United States employees committed ordinary torts recognized by state law. *Ochran v. United States,* 273 F.3d 1315, 1317 (11th Cir. 2001). An FTCA claim is therefore analyzed under the substantive law of the state where the injury occurred. § 1346(b)(1); *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994); *Doe v. United States*, 718 F.2d 1039, 1042 (11th Cir. 1983). In this case, because Plaintiff's negligence claim centers on the medical treatment she received for her eye while incarcerated at FCI Tallahassee, Florida substantive law governs.

Under Florida law, a claim for negligence requires four elements: "(1) the existence of a duty to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a breach of that duty; (3) a 'reasonably close causal connection' between the breach and the resulting injury; and (4) actual harm". *Langbehn v. Pub. Health Trust of Miami-Dade Cnty.*, 661 F. Supp. 2d 1326, 1335 (S.D. Fla. 2009) (quoting *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007)).

The BOP has a general duty of care to prisoners of the BOP. *See* 18 U.S.C. § 4042(a)(2) (establishing the BOP's duty to "provide for the

safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States"). That general duty of care, however, is a discretionary one. *See Cohen v. United States*, 151 F.3d 1338, 1342–43 (11th Cir. 1998) (rejecting the arguments that (1) § 4042 sets forth "any required nondiscretionary actions" and (2) § 4042 "imposes a non-discretionary duty of care on the BOP which removes this case from the discretionary function exception").

"Where Congress has granted an agency discretion in implementing a regulatory statute, the agency's promulgation of regulations or guidelines describing how it will use that discretion is protected by the discretionary function exception." *Id.* at 1344 (citing *United States v. Gaubert*, 499 U.S. 315, 323 (1991)). "Furthermore, if the regulation or guideline 'mandates particular conduct, and the agency's employee obeys the direction, the Government will be protected by the discretionary function exception because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation or guideline.'" *Id.* (quoting *Gaubert*, 499 U.S. at 324.)

In this case, the BOP's policy states that medically necessary—acute or emergent medical conditions warrant immediate attention. Specifically,

Program Statement 6031.04 ("PS 6031.04") provides five major levels of

care that define care provided to inmates, including:

> Medically Necessary – Acute or Emergent. Medical conditions
> that are of an immediate, acute or emergent nature, which
> without care would cause rapid deterioration of the inmate's
> health, significant irreversible loss of function, or may be life
> threatening. Examples of conditions considered acute or
> emergent include . . . [d]etached retina, sudden loss of vision.
> Treatment for conditions in this category is essential to sustain
> life or function and warrant immediate attention.

(ECF No. 100 at 19); Federal Bureau of Prisons, *Program Statement*

*6031.04*, at 5–6 (2014), http://www.bop.gov/policy/progstat/6031_004.pdf.

Assuming § 4042(a)(2) and PS 6031.04 establish a duty on behalf of

the BOP, the question becomes whether the discretionary function

exception applies.[7] When Plaintiff's negligence claim under the FTCA first

came before the Court in Defendants' motion to dismiss or in the

alternative motion for summary judgment, the Court correctly found that

---

[7] *See Lewis v. United States*, No. 14-13484, 2015 WL 3940792, at * 2–3 (11th
Cir. June 29, 2015) (discretionary function exception barred claim by prisoner who had
tripped and fallen down stairs because BOP's policy did not require officer to secure
prisoner with two hands while descending stairs); *Cosby v. United States Marshals
Serv.*, 520 F. App'x 819, 821 (11th Cir. 2013) (United States Marshals Service directive
for prisoner operations merely ensured that prisoners receive medically necessary
health care services and did not specifically prescribe a course of action to follow,
thereby constituting a discretionary matter); *Rodriguez v. United States*, 415 F. App'x
143, 146 (11th Cir. 2011) (BOP employees' supervision of the use of exercise
equipment was a discretionary matter under the INS Detention Standard).

there were sufficient allegations of delay in surgery which placed the claim squarely within the FTCA and outside the discretionary function exception. Specifically, if PS 6031.04 mandates particular conduct via the requirement for "immediate attention," Defendant would not be protected by the discretionary function exception if FCI Tallahassee and its agents failed to obey that direction. This same claim is now before the Court on summary judgment. But what is now before the Court—which was not before the Court previously— is the unrefuted expert testimony from Dr. Rappaport that the delay between the time Plaintiff complained of a problem and the surgery did not cause Plaintiff's current visions problems. Accordingly, Plaintiff's negligence claim fails as a matter of law.[8]

Even assuming that Defendant owed Plaintiff a duty to render immediate medical attention, and that Defendant breached that duty, there is no evidence that the breach caused Plaintiff's present condition. Dr. Rappaport opines, in no uncertain terms, that Plaintiff's current diagnosis

---

[8] This case likely  would have benefitted if Plaintiff had the assistance of an attorney. Plaintiff, however, never sought appointment of counsel with the Court, nor would the Court have had authority to require an attorney to take Plaintiff's civil case on a pro bono basis.

was not caused by any delay in her eye surgery. (Rappaport Dec. ¶ 9.)

Indeed, Plaintiff's lack of visual improvement after surgery on May 24,

2012, was because the macular hole did not close. (*Id.*) But, as Dr.

Rappaport points out Plaintiff's medical condition with her right eye was

stable from January 11, 2012, until her surgery on May 24, 2012. (*Id.* ¶ 8.)

There is no evidence before the Court that Plaintiff's condition deteriorated

between January 11, 2012 and the date of the surgery. And notably, Dr.

Rappaport avers that an acceptable time period between diagnosis of a

macular hole and surgery for the most beneficial outcome is six months.

There is no dispute that Dr. Appiah performed the surgery within six

months of when prison records showed Plaintiff first reported the problem

(January 11, 2012). And despite the fact there are no medical records

evidencing that Plaintiff reported the problem with her right eye on

December 13, 2011, even if she had the surgery still was performed within

approximately six months later.

    Thus, there is no evidence from which a reasonable jury could

conclude that the four-month period between initial examination and

surgery somehow prevented the macular hole from closing where Plaintiff's

condition remained stable—*i.e.*, unchanged—during that four-month period. Thus, on this record, Plaintiff has wholly failed to present evidence demonstrating that Defendant's delay—if any—caused her current vision problems.[9]

Although Plaintiff points to Dr. Appiah's notations that "[t]he soon[e]r the surgery is performed the better the outcome," and his follow up note after surgery that the macular hole was "too old before surgery," the evidence demonstrates that it was ultimately Dr. Appiah's office that actually scheduled the date of the surgery. (ECF No. 100 at 22.) Furthermore, despite Dr. Appiah's single notation that the hole was "too old before surgery," this does not mean surgery should have been performed sooner than the four month period between initial medical visit and surgery.

---

[9] Although Plaintiff states in her amended complaint that afterwards both Dr. Wells and Dr. Appiah informed her that the surgery should have been accomplished within a 90-day period, her allegation regarding Dr. Appiah is hearsay and cannot be considered on a motion for summary judgment. *See generally* Fed. R. Evid. 801–04 (inadmissible hearsay is an out-of-court statement offered to prove the truth of the matter asserted, that does not fall within an exception to the hearsay rule). Nor would Dr. Appiah's statement fall within the exception for statements made for medical diagnosis or treatment under Fed. R. Evid. 803(4), because it was made after the fact and merely suggests blame. Further, even if Dr. Wells' statement was not considered hearsay as a statement as an agent of Defendant under Fed. R. Evid. 801(d)(2), this does not refute Dr. Rappaport's testimony that the delay did not *cause* Plaintiff's current vision problems.

To the contrary, "too old before surgery" does not mean the delay caused the macular hole not to close completely. It simply demonstrates that the hole was too old to heal completely.  On the other hand, Plaintiff has not submitted any evidence to refute Dr. Rappaport's expert testimony that the five-month period before surgery did not cause Plaintiff's current eye problems.  Further, Dr. Rappaport opines that Plaintiff's progressive cataract formation is the likely cause of her further vision loss since Plaintiff's surgery. (Rappaport Dec. ¶ 10.) There is no evidence in this case remotely suggesting that Plaintiff's progressive cataract formation has anything to do with the macular hole. In short, while the surgery did not completely close the macular hole, the unrefuted evidence is that the delay between January 11, 2012 and May 24, 2012, the date of the surgery, did not cause the macular hole to fail to close.

Finally, although Plaintiff argues that Defendant failed to provide her with the eye drops that Dr. Appiah prescribed and failed to give her medical convalescence to remain in the prone position as much as possible, the evidence refutes these unsupported allegations. Moreover, Plaintiff's claim in this case is not that the failure to provide post-operative treatment

caused her current eye problem but rather that Defendant's failure to treat her partial loss of vision as an emergency caused her permanent blindness. *See* Pl. Dep. 80:7–24; 81:1–10; ECF No. 103-5, 132:8–23. Defendant has submitted admissible credible evidence that it didn't. Other than Plaintiff's conclusional statements Plaintiff has not submitted any evidence demonstrating that the delay caused the current vision problem.

Accordingly, because Plaintiff has not submitted any admissible evidence demonstrating that Defendant's delay caused her loss of vision in her right eye Plaintiff has failed to establish sufficient causation to prevail on her negligence claim. Plaintiff's negligence claim, therefore, fails as a matter of law, thus entitling Defendant to summary judgment.[10]

---

[10] Defendant also argues that Plaintiff's negligence per se claim fails as a matter of law. (ECF No. 98 at 19–20.) The Court wrote in its previous report and recommendation, however, that Plaintiff's claim was properly viewed as a negligence claim. (ECF No. 58.) Nonetheless, even construed as a negligence per se claim, Plaintiff's claim fails as a matter of law. To establish a negligence per se claim under Florida law, a plaintiff must show that the defendant violated "a statute which establishes a duty upon a party to take precautions to protect a particular class of persons from a particular injury or type of injury." *Hesterly v. Royal Caribbean Cruises Ltd.*, 515 F. Supp. 2d 1278, 1287 n.6 (S.D. Fla. 2007) (citing *deJesus v. Seaboard Coast Line R. Co.*, 281 So. 2d 198, 201 (Fla. 1973)). Plaintiff, therefore, must demonstrate that she was a member of the class of persons that the statute was designed to protect, that she suffered the type of injury the statute was designed to prevent, and that the violation of the statute was the proximate cause of her injury. *See Tierney v. Black Bros. Co.*, 852 F. Supp. 994, 999–1000 (M.D. Fla. 1994). Plaintiff, however, has pointed to no statute or regulation that Defendant allegedly violated. To the extent that she relies on P.S.6031.04, a BOP Program Statement is a BOP policy,

## V.  CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

Defendant's Motion for Summary Judgment, ECF No. 98, should be **GRANTED**.

 **IN CHAMBERS**, at Gainesville, Florida, this 17th day of February, 2017.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


**<u>NOTICE TO THE PARTIES</u>**

 **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

---

guideline, or interpretive rule, not a substantive law or administrative regulation. *See, e.g.*, *Le v. Augustine*, No. 5:12cv377/LAC/EMT, 2013 WL 2250142, at *7 (N.D. Fla. May 22, 2013). Reliance on § 4042(a)(2) is equally unavailing because the statute does not protect a certain class of people from a particular injury. Nonetheless, as previously discussed, Plaintiff has not demonstrated that the alleged delay caused her permanent blindness. Thus, any negligence per se claim would also fail.